This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-38601**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**JAMES W. LOGAN,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Brett Loveless, District Judge**

Hector H. Balderas, Attorney General
Marko D. Hananel, Assistant Attorney General
Santa Fe, NM

for Appellee

Peifer, Hanson, Mullins & Baker, P.A.
Mark T. Baker
Rebekah A. Gallegos
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**MEDINA, Judge.**

**{1}** Defendant James Logan appeals a restitution order included as part of his sentence, imposed following his guilty pleas to one count of tax fraud (Over $500), in violation of NMSA 1978, § 7-1-73(A)(1), (D) (2006); one count of acting as an unlicensed investment advisor, in violation of NMSA 1978, § 58-13C-403(A) (2009) and NMSA 1978, § 58-13C-102(P) (2009); and one count of fraud (Exceeds $20,000), in violation of NMSA 1978, § 30-16-6(F) (2006). Defendant argues the district court impermissibly shifted the burden from the State to show a direct, causal relationship

between Defendant's fraudulent conduct and the victims' damages to Defendant. Unpersuaded by Defendant's argument, we affirm.

## BACKGROUND

**{2}** From September 18, 2013 to March 1, 2016, Defendant and his wife, Claire, were employed by Shirley Cashwell to provide companionship and medical care to her son, Jonathan Cashwell. Jonathan suffered from physical and cognitive impairments.

**{3}** During the period of time Defendant worked for the Cashwells, Shirley wrote seventy checks to Defendant totaling $520,770.25. Shirley also wrote fourteen checks to Claire totaling $108,021, and wrote two checks to the Sandoval County Treasurer totaling $7,248, neither of which were credited toward any of the Cashwell property. Jonathan also wrote one check to the County Treasurer for $4,090, which he gave to Defendant. Jonathan had no specific memory of giving Defendant the check or authority to pay property taxes but did recall giving Defendant several blank checks during a hospital stay.

**{4}** Based on Defendant's financial interactions with the Cashwells (collectively, Victims), the State indicted Defendant[1] and charged him with numerous crimes related to larceny, fraud, and acting as an unlicensed investment advisor. On September 19, 2018, Defendant pleaded guilty to one count of tax fraud (Over $500), one count of acting as an unlicensed investment advisor, and one count of fraud (Exceeds $20,000). Defendant's guilty plea of fraud encompassed the entire time period that Defendant worked for Victims.

**{5}** As part of the plea agreement, Defendant agreed to pay restitution consisting "of the amount, if any, of the pecuniary loss resulting from the conduct charged" in the plea agreement. Defendant and the State agreed that the "amount and terms shall be determined by the [c]ourt at a hearing to take place following the plea."

### The Restitution Hearing

**{6}** Restitution hearings were held in February 2019 and in August 2019. The district court informed the parties that the evidentiary hearing would proceed like any other evidentiary hearing with the State presenting its evidence first, after which it would allow the defense an opportunity to present evidence. The State called three witnesses: Darla Brewer, a forensic accountant and expert in financial analysis; Gregory Stover, an investigator for the New Mexico Securities Division and the State's case agent; and Toni Oddo, a former caregiver for Jonathan.[2] Defendant also called three witnesses: Claire;

---

1 The State also filed an indictment against Claire for fraud (Exceeds $20,000) in violation of Section 30-16-6(F). However, as part of Defendant's plea agreement, no charges were filed and all charges were dropped against Claire, but Defendant agreed to be responsible for paying restitution, if any, for Claire's actions. Defendant only appeals the district court's order for restitution as it relates to him. Accordingly, our discussion of Claire's involvement in this case is limited to the facts relevant to Defendant's claim on appeal.
2Victim Shirley Cashwell died before the restitution hearings took place.

Dewey Johnson, a retired pastor of Defendant's and Shirley's church; and Brian Wickesburg, another former caregiver for Jonathan.

**{7}** At the hearings, the State presented exhibits and testimony to trace monies paid to Defendant and to connect the checks to any services provided by Defendant. The State reviewed the personal bank accounts of Shirley, Defendant and Claire, as well as Defendant's business accounts, and found that all but two checks written on the Cashwell account were cashed or deposited. The State's evidence indicated that some of the checks paid to Defendant appeared to be proper reimbursements[3] for costs associated in the care of Jonathan, but other checks appeared to be fraudulent and not for reimbursement of services.

**{8}** Testimony indicated that Defendant received checks to pay for gravel and dirt work to tracts of property owned by the Victims and to pay property taxes for Victims' properties, but that no work on the tracts in fact occurred, yet Defendant deposited the checks into his personal account.

**{9}** The State showed that Defendant did not document the nature or amount of the services he claimed to have provided and that Victims paid for, or provide any record of those services, even though Defendant worked for Victims in excess of thirty-three months. Indeed, the State only found one record of Defendant's services to Victims, that being an invoice for marriage counseling for Jonathan. Finally, the State's testimony indicated that when Agent Stover asked Shirley "who [Defendant] was with respect to her" she responded that Defendant was her "financial advisor." After twice identifying Defendant as her financial advisor to Agent Stover, Defendant, who was present, leaned towards Shirley and stated that he does not advise her on specific investments.

**{10}** Defendant also presented witness testimony to the district court about the services he and Claire claimed to have provided. Defendant was licensed in the State of New Mexico as a Clinical Mental Health Counselor, and Claire was a nurse and a licensed Clinical Counselor.

**{11}** Claire testified that she and Defendant provided a range of services to Victims over the course of their employment. Claire maintained that she and Defendant provided companionship care and medical care and management to Victims; marriage counseling to Jonathan; financial advice, management, and services as a power of attorney over real property, stocks and bonds, and banks to Shirley; and acted as a co-trustee of the Shirley N. Cashwell Revocable Trust used to provide funding for the medical care and management of Jonathan.

**{12}** Defendant also presented testimony that he would frequently take Jonathan to lunch and meet with caregivers, but did not frequently visit Jonathan's home. But the State's evidence showed that Defendant disclaimed charging for instances of companionship where he would take Jonathan to lunch or when Defendant would help

---

[3]The State did not seek restitution for checks that appeared to be written for reimbursement purposes.

Jonathan with household bills and disclaimed any compensation for acting as a financial advisor, power of attorney, or co-trustee.

{13}   In closing arguments, the State argued that the district court should award $582,294.25 in restitution—the total payments made to Defendant by Victims over the relevant time frame. The State argued the evidence it presented at the restitution hearing, combined with Defendant's plea of guilty over the relevant time period, permitted the district court to find each payment qualified for restitution. Although the State could not link each check to a specific act of misrepresentation, the State argued that pleading to fraud encompassing the entire period of payments established that Defendant induced all payments using misrepresentation. The State maintained that it was not required to link each payment to a specific act of misrepresentation and that requiring the State do so would be the equivalent of requiring the State to re-prove each instance of fraud.

{14}   In response, Defendant argued that he should only pay $36,748 in restitution—the value of the checks he received for payment of property taxes and property improvements, and the amount he stipulated to paying in the guilty plea agreement. Defendant contends the State's failure to link each check to a specific act of misrepresentation was insufficient to show Defendant induced the payments through fraud, and therefore the State failed to establish a causal connection between Defendant's fraud and the Victim's restitution.

{15}   In its order for restitution, the district court found a causal relationship between Defendant's admitted criminal activity and $406,229.75. This total included the amount to which Defendant stipulated; the amount the State linked to specific acts of misrepresentation; and included $353,037.75 that the district court found could not be reasonably tied to any legitimate services provided by Defendant.[4] The district court noted that Defendant asserted that he provided legitimate services for Victims, despite lacking invoices detailing the amount and nature of these services and that it was the burden of the State to prove these services were not legitimate. But the court found there was little detail provided regarding the Defendant's involvement in the care of Jonathan and found Claire's testimony about the amount of time Defendant spent with Jonathan not to be credible. The district court stated that the "line between legitimate and illegitimate [payments was] blurry at best" and given the surrounding circumstances, "it [was] incumbent upon Defendant to provide the [district c]ourt with some basis to determine which services were legitimate when Defendant has admitted to fraud encompassing the entire period." Defendant appeals the district court order.

## DISCUSSION

{16}   Defendant argues that the language used by the district court impermissibly shifted the burden of proof, requiring Defendant to show that the payments were

---

4The district court did not order Defendant pay restitution for Claire per the plea and disposition agreement because the district court found sufficient evidence to support that Claire's services were legitimate.

legitimate rather than requiring the State to show the payments were a result of fraudulent activity. Defendant contends that the district court's reliance on inapplicable federal precedent was contrary to New Mexico case law and the victim restitution statute, NMSA 1978, Section 31-17-1 (2005).

**{17}** We review sentencing decisions, including orders of restitution, for an abuse of discretion. *State v. George*, 2020-NMCA-039, ¶ 4, 472 P.3d 1235. "To establish an abuse of discretion, it must appear the district court acted unfairly and arbitrarily, or committed manifest error" *State v. Green*, 2015-NMCA-007, ¶ 22, 341 P.3d 10 (alteration, internal quotation marks, and citations omitted). In addition, a district court "abuses its discretion when it exercises its discretion based on a misunderstanding of the law." *State v. Vigil*, 2014-NMCA-096, ¶ 20, 336 P.3d 380. "[W]e review a district court's interpretation of the relevant statutes de novo." *George*, 2020-NMCA-039, ¶ 4.

**Victim Restitution Statute**

**{18}** The victim restitution statute states, "It is the policy of this state that restitution be made by each violator of the Criminal Code . . . to the victims of his criminal activities to the extent that the defendant is reasonably able to do so." Section 31-17-1(A). The restitution requirements derive from definitions listed in the statute. A "victim" is "any person who has suffered actual damages as a result of the defendant's criminal activity[;]" "criminal activities" are "any crime for which there is a plea of guilty or verdict of guilty[;]" and "restitution" is "full or partial payment of actual damages to a victim." *Id.* Section 31-17-1(A)(1), (3), (4). The purpose of the victim restitution statute is to "make whole the victim of the crime to the extent possible." *State v. Lack*, 1982-NMCA-111, ¶ 12, 98 N.M. 500, 650 P.2d 22. This Court has interpreted these statutory provisions as "requiring a direct, causal relationship between the criminal activities of the defendant and the damages which the victim suffers." *State v. Madril*, 1987-NMCA-010, ¶ 6, 105 N.M. 396, 733 P.2d 365. "Restitution must be limited by and directly related to those criminal activities." *Id.* "Mere speculation or supposition as to that relationship will not suffice." *Id.* ¶ 7.

**{19}** This Court has also outlined the procedural requirements for establishing a direct, causal relationship. "In determining whether a direct or causal relationship exists between a defendant's criminal activities and the damages suffered by a victim of those activities, an adequate evidentiary basis must be presented." *Id.* However, a full evidentiary hearing, equivalent to a civil adjudication on the merits, is not required for a district court to determine restitution. *Lack*, 1982-NMCA-111, ¶ 14. Further, the amount of restitution need not be proven by a preponderance of evidence as required in a civil action for damages. *Id.*

**The Burden of Proof for Determining the Amount of Restitution**

**{20}** Defendant contends that previous decisions of this Court require the State to establish the direct, casual connection between the criminal conduct and the amount required for restitution. Defendant relies on *Madril,* and *State v. Rodriguez*, No. A-1-CA-

35558, mem. op. (N.M. Ct. App. Aug. 8, 2018) (non-precedential). Defendant also relies on *State v. Ellis*, 1995-NMCA-124, 120 N.M. 709, 905 P.2d 747, arguing that *Ellis* requires the State to separate legitimate payments from illegitimate payments resulting from fraudulent activity. We agree that both *Madril* and *Rodriguez* require the State to make the initial showing of evidence connecting Defendant's criminal conduct to the damages suffered. *Madril*, 1987-NMCA-010, ¶¶ 7-8; *Rodriguez*, No. A-1-CA-35558, mem. op. ¶ 17. However, a comparison of the facts here to the facts in *Madril* and *Rodriguez* show that the State has met this requirement. Further, we disagree with Defendant's interpretation of *Ellis*, for *Ellis* does not require the State to prove specific legitimacy of each payment. Instead, *Ellis* requires the district court to exclude legitimate payments from the total restitution amount. *Ellis*, 1995-NMCA-124, ¶¶ 18-19.

**{21}** We first turn to Defendant's interpretation of *Madril* and *Rodriguez*. In *Madril*, this Court reversed a district court order requiring the defendant pay restitution for property stolen during a burglary when the defendant had only pleaded guilty to receiving stolen property. 1987-NMCA-010, ¶ 8. The defendant denied any involvement in the burglary and was never charged with burglary or a related crime. *Id.* We held that the defendant could not be ordered to pay restitution for a crime where no evidence in the record indicated the defendant participated in said crime. *Id.* We observed that the State could only speculate that the defendant was involved in the burglary, and held that speculation was insufficient to establish a direct, causal relationship between the criminal activity and the victim's damages. *Id.*

**{22}** Although *Rodriguez* is non-precedential, *See State v. Duryea*, 1998-NMCA-036, ¶¶ 23-25, 124 N.M. 754, 955 P.2d 683, a discussion of the facts further illustrates the standard outlined in *Madril*. In *Rodriguez*, this Court reversed a district court order requiring a defendant to pay restitution for property damage when the defendant only pleaded guilty to receiving stolen property. *Rodriguez*, No. A-1-CA-35558, mem. op. ¶ 17. Further, the State presented no evidence linking the defendant to the property damage. *Id.* In reversing the restitution order, we stated "the district court erroneously relied on the fact that [d]efendant did not offer any evidence that he was not responsible for the damage done to the trailer. The district court improperly shifted the burden of proof." *Id.* We further clarified that the defendant was not required to disprove responsibility in light of the state's failure to present evidence connecting the defendant's criminal act to the victim's restitution. *Id.*

**{23}** A closer examination of *Madril* and *Rodriguez* illustrates that these decisions are distinguishable from the facts of this case. First, unlike the defendants in *Madril* and *Rodriguez*, Defendant pleaded guilty to fraud encompassing the entire period of time when (or in which) he received payments from Victims. The district court did not speculate as to the connection between Defendant's criminal actions and Victims' damages because Defendant admitted to the causal connection when accepting the plea and disposition agreement.

**{24}** Second, unlike in *Madril* and *Rodriguez*, the State did not fail to present evidence of the causal connection here. The State presented evidence of the connection between

the period of fraudulent activity and the victim's damages through records of payments, and witness testimony at the restitution hearing. In its role as the fact finder, the district court found the evidence sufficient to link the Defendant's criminal activities to many of the payments made by Victims. Indeed, in the order for restitution, the district court identifies payments where it found no casual connection due to the State's failure to provide sufficient evidence of such. Unlike in *Madril* and *Rodriguez*, nothing in the record indicates the State failed to establish a causal connection between Defendant's criminal conduct and the amount to be repaid in restitution.

**{25}** Defendant also argues that *Ellis* requires the State to separate legitimate payments from illegitimate payments. We disagree with Defendant's interpretation of *Ellis*. In *Ellis*, the defendant pleaded guilty to tampering with evidence and embezzlement, having obtained stolen drugs while employed as an undercover narcotics officer. 1995-NMCA-124, ¶¶ 1-2. The defendant appealed the district court's restitution order that required him to pay restitution to the police department where he worked as an undercover officer. *Id.* ¶¶ 1, 3. The restitution order included the defendant's salary, expense money, and money for drug purchasing as part of the defendant's work. *Id.* ¶ 3.

**{26}** This Court in *Ellis* affirmed the district court's amount of restitution. *Id.* ¶ 17. We reasoned that, in an instance where legitimate services were mixed with criminal activity, a district court could not include the value of the legitimate services in restitution because those services, regardless of the criminal activity, were provided to the victim and were of some value. *Id.* ¶¶ 17-18. But where legitimate services were never provided and the victim received no benefit, the entire amount of the loss can be included in restitution. *Id.* ¶ 18-19.

**{27}** We conclude that *Ellis* does not require that the State prove legitimacy of each possible payment, but rather requires that a district court exclude payments for legitimate services provided in an order for restitution. As such, we conclude that the district court properly applied the law. In its order for restitution, the district court did not include payments made to Defendant where there was sufficient evidence showing that the payment was for legitimate services. As outlined in *Ellis*, the district court did not include the value of these payments because Defendant did provide legitimate services that were of some value to Victims, regardless of Defendant's criminal activity. Further, the district court followed Defendant's disclaimers of non-payment in determining which payments the district court should consider legitimate. The State presented evidence that the remainder of the payments were illegitimate, and there was no evidence presented indicating otherwise. As such, the district court determined which of the remaining payments were illegitimate, and added them to the total amount for restitution.

**{28}** Therefore, we conclude that the district court properly applied New Mexico precedent, as outlined in *Madril*, *Rodriguez*, and *Ellis*, in determining the restitution amount awarded to Victims.

**The Restitution Order**

**{29}** Finally, we address Defendant's argument that the district court improperly based its decision on federal case law and statutes in requesting that Defendant present evidence about the correct amount in restitution. We agree with Defendant that the federal case law cited to in the district court's restitution order does not constitute binding precedent. But, based on Defendant's admission to engaging in fraudulent conduct during the relevant time period and the record of the restitution hearing, we conclude, despite the district court's citation to federal law, that the district court's order for restitution and statement that Defendant was incumbent to present evidence of legitimate services was proper based upon the language of Section 31-17-1 and New Mexico precedent.

**{30}** The victim restitution statute states "the court *shall* require as a condition of probation or parole that the defendant, in cooperation with the probation of parole officer assigned to the defendant, promptly prepare a plan of restitution, *including a specific amount of restitution to each victim* and a schedule of restitution payments." Section 31-17-1(B) (emphasis added). Further, "[i]f the defendant believes that no person suffered actual damages as a result of the defendant's criminal activities, he *shall so state*." *Id.* (emphasis added). The statute places a burden on the defendant to present a calculation of the correct amount of restitution, which necessitates some presentation of evidence by the defendant. Indeed, that is what Defendant did here–he presented three witnesses to testify on his behalf about his relationship to Victims and the services he provided. In its order for restitution, the district court weighed the credibility of these witnesses and made its determination based on evidence presented by both the State and Defendant.

**{31}** A defendant's opportunity to present evidence on their behalf is integral to the restitution calculation. "A judgment and sentence imposing restitution following entry of a plea and disposition agreement is subject to challenge, unless a defendant has been given adequate notice that restitution may be imposed, the amount of possible restitution, and the defendant is accorded an opportunity to controvert the amount of possible restitution." *State v. Lozano*, 1996-NMCA-075, ¶ 12, 122 N.M. 120, 921 P.2d 316. What Defendant characterizes as a burden shift was rather his opportunity to contest the State's evidence that he failed to provide legitimate services.

**{32}** We hold that the district court's restitution determination is in accord with New Mexico precedent, as outlined in *Madril*, *Rodriguez*, and *Ellis*. Further, we hold that requesting a defendant to present evidence to controvert the amount of restitution claimed does not improperly shift the burden of proof once the State has presented sufficient evidence linking the defendant's criminal conduct to the victim's damages. Rather, it is an exercise of the defendant's statutory right to contest the amount of restitution. Given that the district court's order for restitution was supported by New Mexico precedent and Section 31-17-1, we therefore conclude the district court did not abuse its discretion based on a misunderstanding of the law. *See State v. Vigil*, 2014-NMCA-096, ¶ 20.

**CONCLUSION**

**{33}** For the foregoing reasons, we affirm the district court's order for restitution and the amount required of the Defendant.

**{34}   IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**KRISTINA BOGARDUS, Judge**